HULDAH H. SCHANCK

*v.*

CHARLES W. SCHANCK.

Where a wife in anger told her husband that he "might go his way and she would go hers," and gave other evidence of her desire that they should live separate, but immediately retracted and besought him not to go, and he, notwithstanding her entreaties, left her, in a passion, and, without any attempt at reconciliation and without contributing anything towards her support or even communicating with her in any way, remained away from her for three years, living all the time in the same county with her—*Held*, that she was entitled to a divorce for desertion.

---

Bill for divorce. On final hearing on pleadings and proofs.

(363)

*Mr. W. T. Hoffman,* for complainant.

*Mr. B. Gummere,* for defendant.

THE CHANCELLOR.

This suit is for divorce from the bond of marriage, and is brought by a wife against her husband. The ground is desertion. The bill was filed on the 12th of August, 1878, and it charges that the defendant has been guilty of willful, continued and obstinate desertion of the complainant for a period of three years and more before the filing of the bill. The time stated as the beginning of the desertion is the 25th of January, 1875. The parties were married in this state, in January, 1871, and they are and have been ever since the commencement of the alleged desertion, and were previously thereto for about two years, residents and inhabitants of Monmouth county. By far the greater part (and indeed almost all) of the large amount of testimony which has been taken in the cause has reference to matters (the history of the married life of the parties prior to the desertion) which in my view of the case it is not necessary or profitable to advert to at any considerable length. A glance at the main facts will be enough on that score. Immediately after their return from their wedding tour the parties went to reside in the city of New York, where the defendant was engaged in business as a broker. They boarded there until the middle of April, 1871, when he failed in business. He proposed to his wife to go to live with his parents in One hundred and fifty-second street, but she preferred to come out to Keyport, where her parents lived, and they came out accordingly, and boarded with her father until the spring of 1872, when they went to his mother's farm at Cream Ridge, in Monmouth county. They remained there until the scarlet fever broke out in the tenant's family (seven persons being ill of the disease at the same time), and then the complainant returned to her father's house, but the defendant stayed. The complainant, after six weeks' stay at Keyport, returned to Cream Ridge and stayed till November, 1872, when she and her husband went to Keyport, and from there, in same fall, to

Brooklyn.   They boarded in the last-mentioned city until April, 1873, being supported by an allowance of $25 a week, made to the defendant by his father.   While in Brooklyn, the defendant endeavored to obtain employment as a clerk, but without success. In April, 1873, his father having met with losses in business, refused to continue the allowance, but invited the parties to come to Cream Ridge, offering to board them in his house and pay the defendant $1 a day for his services around the place.   The defendant, having no other resources, went accordingly, but the complainant was unwilling to go, and remained with her parents at Keyport, which is about thirty-five miles distant from Cream Ridge.   The defendant, on the one hand, attributes her refusal to live with him at the farm to her dislike of agricultural life and her mortification at his accepting employment so far below the measure of his capabilities.   She, on the other hand, avers that the reason was merely her unwillingness to live with his mother, whose sour temper and unpleasant treatment had rendered her unhappy during her previous stay there.   The defendant continued at the farm until the spring of 1874, when he entered into a new agreement to work it " on shares ;" he and his wife to have for their occupation a part of the house separate from that occupied by his parents.   The complainant refused to go there.   In February, 1874, an agreement was suggested and drawn up by a friend of the defendant's, at whose house the parties were paying a short visit of a few days together, by which the defendant, on the one hand, agreed to make an effort (by going to New York to " board, advertise and answer advertisements " for ten days, if his parents would furnish the money), to get employment in New York or its vicinity at a salary of not less than $600 a year with a prospect of promotion, and she, on the other hand, agreed that if he should make the effort and fail, she would go to the farm and without complaint perform her duties there.   She declined to go, however, and stayed with her parents ; her husband remaining on the farm, working it under the agreement, and visiting her occasionally.   In January, 1875, he was at her father's house on one of his visits, and while there the occurrence took place from which the complainant dates the

desertion, and of which it will be necessary to speak at length. The defendant then left the complainant, and though he has ever since lived on the farm and she at her parents' house in Keyport, he had never, up to the commencement of this suit, contributed to her support or even communicated with her in any way. The transaction of January, 1875, just referred to, occurred on Friday night and Saturday morning, the 19th and 20th. The complainant narrates it as follows:

"Friday night we were talking, and I wanted him to get something to do, and got to talking about it, and he got angry with me, and I can't tell you what he said, but he left the room; that was the time he went out of the house when he said he walked round several times, and then he came back again; he was talking about everything; he wanted me to live with his mother, and I said I would not do it; then I wanted him to get something else to do, and we were talking about that; then he came back and went to bed, and the next morning he went to New York. Sometime before that, the visit before, when he came to our house, he asked me for the ring that was given with the understanding that when I was tired of him, I would give it to him; but he took it away from me himself, and I cried and he gave it back to me; and he had before repeatedly asked me when I was tired to give him that ring back and he would understand; after we had those words Friday night, Saturday morning I turned round and gave him that ring; I did so because I felt completely tired out with him—worried and worn out, completely exhausted—so that I thought that I could not stand it any longer; he took the ring and we then went down to breakfast; he was very pleasant and talked with them all; I was very silent, and when we went out of the dining-room door, he did not say good-bye to me, so I said to him, 'Ain't you going to kiss me good-bye?' he said 'Yes,' and kissed me and left; he came back Saturday night with the boat and treated me very coolly and indifferently; he did not say anything—did not say a word; I don't think we said five words to each other; the evening passed, and at night we retired; he and my father had a long conversation, and I heard him say that he had made so much on the farm—between $400 and $500—and my father said, 'Haven't you got anything for your wife when you have made so much?' he said, 'Sometime I will give her something;' then I went up stairs and thought it all over; I thought I could not live this way any longer, so I went down stairs and said to him, 'You can go your way and I will go mine; I can't stand this way of living any longer;' I went up stairs, and after awhile he came up and said, 'Where is that tin box with the papers?' and with that he kissed me good-bye, and as he got to the top of the stairs I ran out and took him by the coat, and he jerked himself away, so that he hit himself against the wall, and I halloaed to him to come back; he paid no attention to me, and that was the last time I saw him."

She gives as the reason why she ran after him and pulled him back, that she "had feeling for him, and felt sorry." She says that when he went away it was between ten and eleven o'clock at night. It appears that what she cried after him to induce him to come back, was "Charley, won't you come back?" She testifies that when she gave him the ring, and said he might go, she meant, not that he might go forever, but only for that time. From his testimony, which corroborates her in all essential respects in this narrative, it appears that the ring was given before their marriage, and that the understanding which she said existed between them as to using it as a means of denoting her desire to be released from him, had reference to their betrothal merely. He also says that when she told him he could go his way and she would go hers, her manner was sorrowful. It is quite evident from all the testimony on the subject that the difficulty between them arose from the complainant's dissatisfaction with the effort made by the defendant to obtain more suitable employment, and her conviction that she would be unable to live comfortably with his mother on the farm. There seems to be no reason for doubt that that conviction was well founded. It is urged, however, on behalf of the defendant, that it was her husband's right to choose his employment and his place of residence, and it was her duty to accept his choice, and go with him to his domicile and reside there with him. The decisive question in this case is not, however, whether the complainant was right or wrong in refusing to go with her husband to the farm and accept his selection of a pursuit and place of abode, but whether what took place between him and her, as above testified, justified him in abandoning her, in depriving her of his society and of all support, and in never making any, even the least, effort to ascertain whether she had not changed her mind, or could not be induced to do so. It is urged, in his behalf, that when she gave him the ring and subsequently told him he might go his way and she would go hers, she, in effect, deserted him, or at least expressed her desire for or consent to an indefinite separation. But she swears, and her statement is corroborated by the circumstances as detailed in the testimony, that she had no inten-

tion of expressing a desire for a final separation, but only to
express her resolve in regard to the subject which was the cause
of difference between them.  She appears to have intended to
express only her determination not to go to the farm to live if she
had to live in the same house with his mother, and that, too,
merely because of her conviction that she could not live in com-
fort there with his mother.  But, moreover, after she had given
the ring and made that expression, and her husband had gone
out of the room to go out of the house, she strove to detain him,
and called after him in a tone of entreaty, " Charley, won't you
come back ? " thus showing that she did not wish him to go,
but desired that he should return to her in order that the subject
might be further considered, perhaps with a view to a submis-
sive compliance on her part with his wishes.  Her father, as the
defendant left the house, invited him to stay for the night, but
the defendant, conceiving that he had been treated with indignity
in what had passed, refused to listen to the entreating call of his
wife or her father's exhortation.  For three years and a half
before the bill was filed he denied his wife any, the least, attention
or recognition, but permitted her to live in a state of separation
from him, wholly dependent on her family for her support.
His reason for it seems to have been the wound which his pride .
received when his wife told him he might go his way and she
would go hers.  Under the circumstances of the case, the husband
owed a duty to his wife—a duty to society—to avoid, as he well
might have done, the consequences which his punctilious resent-
ment (so exacting that he would not even condescend to propose
the terms on which it might be appeased), has inflicted upon his
wife.  He was not at liberty to leave her uncared for and un-
protected.  If his excuse were her refusal to live on the farm, it
could not be accepted, for he abandoned her in January, while
the arrangement under which she refused to live on the farm
was not to take effect until April following.  But the expression
of her resolution not to live on the farm was not, in fact, the
occasion of his withdrawal from her.  His complaint against
her was not on that account, but on the ground of her treatment
of him on the occasion of his last visit to her.  He says that all

Schanck v. Schanck.

the time he expected she would come to him at the farm. Indeed, he corrects the record of his testimony lest he should be misrepresented where it made him say that she had not offered to live in the tenant-house on the farm. The proof is clear that she was quite willing to do that, and had offered to do it; that she was not unwilling to live on a farm, or on his mother's farm, but was not willing to live in the same house with his mother. Manifestly, he was actuated in his abandonment of her merely by resentment and pique. When asked on the witness-stand whether his going away from her and refusing to see or communicate with her was because he would not sacrifice his dignity sufficiently to do so, he replied that he "would not under the past circumstances and her orders," and he admits that he never, after his withdrawal, signified to her the possession on his part of the slightest interest in her welfare, or contributed of his means a single cent for her support, or offered her a home with him. And he bases his justification of his conduct towards her on his regard for his self-respect, saying that he never expected to cross her father's threshold again until he should have received her invitation or that of her family to do so.

It is clear that she never intended to desert him. Her letters offered in evidence by him contain the very strongest expressions of affection, and were undoubtedly sincere. Were he before the court asking a divorce from her on the ground of desertion, his application would be denied for the reason that he has been derelict in his duty towards her under the circumstances. *Jennings* v. *Jennings, 2 Beas. 38 ; Cornish* v. *Cornish, 8 C. E. Gr. 208 ; Bowlby* v. *Bowlby, 10 C. E. Gr. 406.* In *Cornish* v. *Cornish,* which was a suit by a husband against his wife for divorce for desertion, the husband had come home late at night and the wife was slow in admitting him into the house. He resenting her tardiness and discontent at being so disturbed, threatened to chastise their child of a year old because, having been awakened by the noise of the altercation, it very naturally cried. She snatched the child up and flew into a passion, and declared her determination to leave the house (her husband's father's) and go to her father's house as a refuge from such treatment, and that

24

she would never live with her husband again and would get a
divorce. Her husband harshly bid her look to the consequences
of such a step. She went home that night. ·Said the chancellor,
in refusing the divorce :

"He [the husband] sent her away in this mood at midnight, with a
hired man, to her father's house, three miles distant. He has never been to
her since, to seek for reconciliation or ask her to return. He has met her a
number of times without speaking to her. Her temper may be too quick and
too violent, but it was his duty to go to her after leaving under these circum-
stances, and see if some contrition, some concession on his part, would not do
away with the effect of his harsh conduct on that night. Her threat, in the
anger of the moment, never to live with him and to obtain a divorce, is not
sufficient excuse for not making the attempt. He has acted as if he were
anxious to convert a small quarrel between him and his wife, in which he was
both much and most to blame, into a legal ground for divorce. He has not
made the advances or concessions which a just man ought to have made to put
an end to this desertion."

That reasoning is applicable to the case under consideration.
It declares and defines the duty of the husband under such cir-
cumstances as are presented here. And the reasoning is founded
on a just view of the marital relation which imposes upon the
husband the duty of maintaining, for the benefit of himself and
his wife and also of society at large, the integrity of the matri-
monial tie, and to that end requires of him effort, and, if need be,
concession and persuasion. To the same purpose and in the same
strain is the language of the court in *Yeatman* v. *Yeatman, L. R.*
*(1 P. & D.) 489 :*

" It would be of evil example if this court should hold that mere frailty of
temper, unless shown in some marked and intolerable excesses, was a reason-
able ground to justify a man in throwing a young wife upon the world without
the protection of his home and society. A woman so placed is open to many
temptations. If she fail to resist them the husband who has already quitted
her will not be slow to take advantage of her fall, making his own desertion a
first step towards a claim for divorce. True, she may at once insist on return-
ing to him, and may obtain a decree obliging him, if within the jurisdiction
of this court, to receive her àgain, and thus terminate the desertion. But
angry feelings, the prompting of pride or the advice of others may intervene.
The wife may not be inclined to protect herself by forcing her society upon a
husband bent upon casting her off, and if the result is criminality, the original

fault still lies at the husband's door. If submission is the part of the wife, protection is no less that of the husband, and he is bound to extend that protection to his wife, even against herself and her own impulses, so far as the fences, the restraints and the inducements of conjugal cohabitation may serve to that end."

In this case, it is pertinent to say the defendant gives, as one of his reasons for not going to see his wife, that "he had heard reports, too, that were not complimentary." The reports to which he refers appear to have been the merest idle village gossip, but such as they were she would in all probability have been spared the annoyance and mortification of being the subject of them if her husband, thinking more of his wife than of his pique, had done his duty towards her. It is to be observed that the marital relation between these parties remained unbroken up to the time when the withdrawal took place, and that it was broken only by the defendant's ceasing to visit his wife. After he left her he neither requested her to come to him or to visit him at any place. He never proposed to her any terms of condonation of what he appears to have regarded as her offence against him. When he saw her he would not recognize her. In short, in all things he treated her as a mere stranger.

The husband who withdraws himself wholly from his wife's society, refusing to make any provision for or have any communication with her, *prima facie* deserts her, and if he continues such treatment for three years, she will, in the absence of lawful excuse on his part, be entitled to a divorce. The defendant has so dealt with the complainant in this case, but to rebut the presumption to which his conduct gives rise, he by his answer alleges (denying the desertion while he admits the withdrawal) that he has informed her that his house on the farm was always open to her and that it was his greatest desire that she should come and live with him, but she refused again and again until he lost all hope of reconciling her to his life and home on the farm. But in point of fact he has never communicated with her at all on any subject in any way since he left her. That he intended to abandon her there can be no doubt, for he did actually abandon her. That he never placed any limit to the time

the abandonment was to continue, as by imposing terms or conditions her compliance with which would restore marital relations between them, is equally indisputable. It is also beyond question that he manifested no desire for nor expressed any expectation of a renewal of connubial relations. He left her without providing for her support, and has lived in the same county in which she has resided ever since, and for three years and more before this suit was brought he treated her as if he had cast her off forever, and gave her to understand nothing to the contrary. He has made himself amenable to the law which authorizes the court to decree a divorce for three years' willful, continued and obstinate desertion.